Clerk, please call the next case. 207-547, Costco Wholesale v. John Tribulu. May it please the Court, Mr. Turner, Elaine Newquist on behalf of Costco. John Tribulu's case involves an initial 19B decision that was decided several years ago that involved his original injury to his low back on June 14, 2003. And as I know you are all familiar with the underlying facts, I will not state them in great detail, but it was somewhat of a unique circumstance. The gentleman had a strep pneumonia virus in his system, and on June 14, 2003, when he fell backward and landed on his buttocks, it was the opinion of the infectious disease specialist, Dr. Hirsch, that that allowed a sufficient bruising or damage in that area to in turn allow for the infection to seed or settle at the L4-5 level and to do some further eating away or end plate damage at L4-5. The original 19B had been tried because there were several doctors' opinions regarding whether the extent of damage at L4-5 could have occurred as quickly as it had if one were to assume that it was only as of June 14, 2003, when he fell at work, that this whole process started. It was the decision of Arbitrator Fradiani and then the Commission that the incident, the timeframe fit in their opinion, and they adopted Dr. Hirsch's opinions with respect to that issue. And they did a couple of things. They ordered temporary total disability for a certain period, but not all the way up to the date of the hearing. And second and more importantly, they ordered the employer to pay for the review and opinion of a surgeon who could now address whether Mr. Tribula required surgery in the low back. At the time of that initial 19B, the only current treatment he was receiving was with his family physician, a doctor named Dr. Coltro. And it was the opinion of the arbitrator and the Commission that Dr. Coltro, as a family physician, lacked the expertise to determine the exact nature of that low back condition, and more importantly, whether or not he needed surgery in his low back. Because one of the things Mr. Tribula was asking for in that initial 19B decision was surgery. Subsequent to that first Commission decision, the employer made arrangements for Mr. Tribula to be examined by Dr. Phillips with Midwest Orthopedic. And the information was sent to Mr. Tribula's attorney, and Mr. Tribula's attorney raised no issue with Dr. Phillips, and in fact allowed for his client to attend this appointment with the doctor. Dr. Phillips' ultimate opinion was interesting in a couple of levels. And again... It wasn't a sort of qualified, I mean, you can see elements of Phillips' opinion as we look at it that supported in some way Dr. Coltro's connection. Yes. What we've got is a gentleman that's got a longstanding low back problem. So all of the doctors, as they've worked through this, have been parsing out what is and is not related. It was the conclusion of the Commission that the level of damage is at L4-5. However, that the gentleman also has several other conditions throughout the lumbar spine. Osteoporosis actually caused fractures at, I believe, L1. He's got some end plate damage at L5-S1, which is one level, of course, below where the infection was. But what Phillips' opinion was, and I'm going to be honest, I've never dealt with this before, the infection and the end plate damage that occurred as a result of that infection at L4-5 actually resulted in what he termed an auto-fusion. Akin to what a doctor would go in and try to do had they tried to fuse the spine at that level. So what it does is it sort of, I guess in layman's terms, locks in that area. And Phillips says at this point in time, he not only doesn't need any surgery at that level or any further treatment at that level, but that level is no longer pain-producing for him because it's accomplished what a surgeon might have otherwise offered for him years earlier. So it was his conclusion, number one, that Mr. Tribula didn't require surgery at the work-injured level. Number two, that he no longer had symptoms from that work-injured level. And finally, that the other levels of the lumbar spine were so diseased and so degenerated that those were probably what was causing his problem. I think that Dr. Phillips' opinions have to be taken into consideration in a different light than what Mr. Turner would like you to now look at it as, because it is not a Section 12 exam. We're all familiar with Section 12 exams. The Petitioner goes out and gets his, the Respondent goes out and gets theirs, and everybody gets what they paid for. How do you interpret this testimony by Phillips? And I think you've done a good job of candidly discussing it. He testifies, quote, Clayman was disabled based on the constellation, I like that phrase, of things going on in his back, including the infection he suffered as a result of his work accident. Clayman's infection was a cause of the need for disability, and the infection played a role in Clayman's condition. Does that not support Clayman's position? Only to a certain extent, because what we're then asked to do is to parse out what is work-related from what is not. There is no testimony from any doctor that this particular incident did damage at any other level, accelerated at any other level, aggravated at any other level. And, in fact, what we know is that Mr. Tribula was already under active medical care for his low back. In addition to the three surgeries he'd had going back to the 90s, one week before this incident, he had been in his family doctor's office advising the doctor he was having back pain, for which physical therapy was ordered, three prescription medications were ordered, and an MRI was ordered. So we are not dealing with a pristine situation. I think what Dr. Phillips' testimony went to is to isolate that which was work-related from that which was not. And it was opinion that the one level, and we see this all the time. You know, what residuals do you have from the level at which you sustained the injury, from the level at which you were damaged? And what Dr. Phillips did very carefully, and we took a long time with him to get to this, is to establish the L4-5 area is as good as I could have gotten it if I had operated on it. And he specifically testified it's not symptom-producing. And we don't have any other testimony to the contrary, because the only other opinion we have is from Dr. Coltrow, who's the family doctor, who treats him for a multiplicity of problems, who testifies that he's seen him for everything under the sun, including a subsequent back injury, who testified he cannot identify what, if any, of Mr. Tribula's current complaints are related to any level of the spine, because he's not a surgeon. And in an interesting twist of fate, Dr. Coltrow even testifies that he wanted to refer Mr. Tribula to Midwest Orthopedic for a consultation, which happens to be exactly where Dr. Phillips is. So I think we've got a different situation than we typically see. We've got no other orthopedic or credible opinion at all but Dr. Phillips, and Dr. Phillips isn't a Section 12 exam. It's a commission-ordered exam. It doesn't go so far as the impartial medical, which Section 19c1 talks about. I don't think I've ever seen one, because my understanding is those were doctors the commission paid for, and as we all know, they don't have the funding for it. But it rises to a higher level because it's something that the commission previously recognized was not being addressed by the doctors who were treating him. It is a doctor who needed to be credible, and if there was an objectionist whose credibility, his expertise, his ability to judge this matter, counsel would not have agreed to this exam. Let me ask you this kind of question. Are you saying there's no evidence in this record to support the commission's conclusion on causal connection? The commission, Arbitrator O'Malley's decision in the commission simply affirms, finds him permanently and totally disabled, and doesn't identify why. And if you go back to what the work injury is and what Dr. Phillips has testified to, and the fact that he establishes that that problem, for all intents and purposes, is solved, then you look at what Mr. Tribula testified to. He's got a subsequent back injury. He's got back pain which the orthopedic expert says is from the other levels of the spine, not in any way touched or aggravated by this work incident. He's got hearing difficulties. He's got difficulty gripping a steering wheel. And their vocational expert says it's the totality of these circumstances which prevent him from being gainfully employed. Mary Schmidt testified that if you simply looked at a man with a fused L4-5, with the work level that he would be released to for that condition, he's not permanently and totally disabled. So we've somehow circled back around to the fact that we've got an individual that, from a medical standpoint, was cured, for lack of a better term, from the ill effects of the specific injury. And keep in mind, every one of the doctors at the time of that original 19B decision testified, this is a unique circumstance. It's this teeny little bit of damage at L4-5 that allowed the infection to settle. The infection then did the damage. The infection, of course, was cured with antibiotics. So it was Phillips' opinion that it was now auto-fused and therefore symptom-free. And I think that's what we've got to focus on. Had Dr. Coltro ever released him to go back to work? Dr. Coltro testified that he had not. And he also testified that he really was not in the position to judge what levels were impacting this gentleman, what his capabilities were, what he was or was not capable of doing. Didn't Dr. Coltro go on to say, though, that there had to be some residual effect of the infection and so forth? And the arbitrator picked up on that and said, I agree with Dr. Coltro, there had to be some residual effect. And I don't think that anybody standing here, if, you know, we're all forced to sort of break these things down. I don't think I would be standing here with a straight face and saying, this gentleman isn't entitled to some permanency because he had an injury at L4-5. There are going to be some residual effects. Okay. Strictly from. I understood you to be arguing that really there was no dispute between medical professionals for the arbitrator to choose from, that there was no, nothing in the record, as far as medical opinion, that he would have continued to have some kind of ill effect from this autofusion or whatever you. My understanding from the doctors is that when you fuse the spine, it results, it eliminates the pain. But it results in some. It's supposed to anyway. It's supposed to. We all know it doesn't always, but. Well, that's partial permanent disability, I believe. But it's supposed to eliminate the pain. But the flip side of it is that you've got some rigidity. You're subject to some additional fractures or damage at the upper and lower levels of the spine. We've all seen it. I don't think anybody here can stand here with a straight face and say that this gentleman doesn't have some problems. But then you flip it around and you say, what is the basis upon which the experts concluded he couldn't return back to work? And it was his testimony regarding all of his complaints. He can't walk. He can't sit for very long. He can't stand for very long. He can't drive. None of those are because of the L-4-5 level. And that was Dr. Phillips' point. Okay. So you're basically saying that, yes, there's some permanencies to be attributed to this autofusion. Correct. Which you concede is connected to a work-related accident. Correct. But that this other stellar group of symptoms. Constellation. Constellation. Thank you. Good. It comes back. There's nothing in the record to attach those to the work-related accident. Right. Unlike every other case I've had, there is no opinion that any of these other areas were aggravated. In fact, the earliest testimony in the original 19B involved the fact that there was end plate damage going on at both L-4-5 and L-5S1, even before the infection at L-4-5. So this is a guy that's got these advancing changes. I had never heard of osteoporosis in a man of this fairly young age resulting in fractures, which was another thing that Dr. Phillips had said. This is a guy with a very, very bad advanced low back. And it's that constellation in addition to all of his other health issues. And keep in mind, Phillips was of the opinion that there was some market for his employee. And Mr. Tribula specifically testified, again getting into the permanent total purview, he has never looked for work at all. He's applied for social security disability, and he's got these other health problems now, which are impacting his function and his ability to operate. Counsel, you'll have time on rebuttal. Thank you very much. Counsel, please. Please record, Counsel. My name is John Turner, representing Mr. Tribula. There have been a number of comments made that I want to address here. My brief, of course, goes over things in more detail. But there is conflicting medical opinion, and the opinions of Dr. Coltrell are to be considered along with those of Dr. Phillips. But before we even get to the issue, bear in mind, Dr. Phillips was supposed to simply determine the need for surgery. Instead, when he asked, what am I supposed to do, he sent a letter to the claims people. Incidentally, Dr. Phillips never contacted me. I didn't exist, as far as I know, in the mind of Dr. Phillips. They didn't come back and tell him, well, all you're supposed to do is determine the need for surgery. They came back and said, no, review this thing, and let's get into other issues. I should have objected. I fell asleep. The only issue that should have been testified to by Dr. Phillips was whether or not surgery is needed or feasible. And in order to make that determination, Dr. Phillips did not have to get into the notion of, well, does he have a current condition that is or is not related to the work accident. All he had to do was assess the most recent MRI studies from December of 07, when he was seeing him in June of 08, and conduct his exam and make a determination, is surgery necessary or not? And that's it. That's what he was supposed to do. No, he didn't. Because they asked him to when he contacted the claims people, he got into the issue in his testimony of, well, what's wrong with this man now is all something of a preexisting nature that simply continued to progress. Yes, he had an infection. Yes, it left him with an autofusion. Let's look at that. Let's say that you had introduced a timely objection, and so his testimony is limited to whether or not he needs surgery at that level. Okay? Yeah. Where does your case stand then in terms of causation at that point? Causation was found in the first decision by Arbitrator Fradiani, which was adopted by the Industrial Commission, other than, well, and they adopted also the notion that we should get someone else, another doctor to come up with the idea. Well, I'm asking the question, would there be enough there for permanent total? Because the first decision didn't grant you permanent total, did it? No. It was a 19B, and they're restricted in that sense. Right. But so there hadn't been a determination on permanent total, correct? There had to be. So what's the state of the record? How did you prove your case to be permanent total if we agreed, or hypothetically, a timely objection was sustained, and Dr. Phillips, or whatever his name was, just only said, there's no need for surgery? Then we would have the testimony, the deposition, evidence deposition of Dr. Coltrane. Right. And in that evidence deposition. Who said, is it incorrect, well, I don't really know I'd send him off to Midwest Orthopedics to get a decision? That's not all he said. He also said he reviewed the most current MRI studies from December of 2007. The radiologist reporting in those MRIs says we have pyramidal encroachment at L4-5, which is pressing on the L4 nerve bilaterally. Dr. Coltrane repeatedly said in his deposition, I believe that what we're looking at there, and he said, I looked at the various studies, and as you go forward in time, first there's an abscess that resolves, and then you have bony remodeling and bony reformation as a consequence of the abscess having been there, and that has resulted in the pyramidal encroachments at L4-5 pressing on the L4 nerve. That would have been the testimony. And incidentally, the report of Dr. Phillips is in evidence, the first report, and he states in that report, in his history that he gets from the man, that he was doing well up until the fall, and then since the fall of June 1403, he has had a lot more increase in his pain and problems. I am suggesting that that's the development of the situation that Dr. Coltrane testified to in his deposition, and if Dr. Phillips had been objected to timely and stopped, I would have proved without a problem. I went into detail. The reason why the Industrial Commission accepted what arbitrator O'Malley said in the second decision concerning causation and the idea that the man was still suffering from aftereffects of the infection, arbitrator O'Malley said that he believed what Dr. Coltrane said, that this infection occurred and it had to leave some after effects in terms of bony remodeling and changes. Dr. Phillips, and I believe that he became a bit of an advocate for the defense position here, in my opinion, said, well, no, the only thing that happened is he had this beneficial autofusion take place and everything else came and went, and he's better off, basically, from this infection, which was right in the end plates of the L4, L5 area. And those end plates, yes, on June 1403, an X-ray showed that the end plates had some irregularity, an X-ray done at the hospital where he was taken emergently from his fall. And then 12 days later, another X-ray was done and said, yes, there's moderate irregularity at L4, L5. Dr. Phillips somehow arrives at the conclusion that he never saw these films. He just read those very same reports and looked at the same language. Yet he says, and counsel quotes him in saying that, oh, he had advanced problems, advanced problems at L4, L5. Well, the plain English reading of the language there, he may be the greatest surgeon in the world, but the plain English reading of that is nothing that would, I mean, an appropriate adjective. If it was advanced, we would be seeing words of that nature described in the L4, L5 situation as of June 1403's X-rays and as of June 2603. Nothing like that shows up. And then July 503, the MRI shows now that this infection has really taken root and it's destroyed. It's the word they used, the L4 end plate and the L5 end plate, the inferior L4 and superior L5 end plates. Well, that's the same area that had some irregularity about three weeks earlier. But I asked Dr. Phillips, well, wouldn't that irregularity then be advanced and aggravated? And he just, there's no explanation for it. He says, no, not in this case. But theoretically, yes, it could happen. But it didn't happen in this case. That's why I believe that the testimony of Dr. Coulter, who incidentally, half of his practice deals with backs, back patients. That's what he testified to in his first deposition. And that's why these inconsistencies or these inexplicable comments by Dr. Phillips on the idea that, well, there's really nothing wrong with him anymore. They were not accepted. The credibility of Dr. Phillips was reviewed and compared with that of Dr. Coulter on the issue of, is there something still persisting here? And on this medical issue, which the commission has got deference, accorded it, the commission accepted Dr. Coulter because he made more sense than what Dr. Phillips' testimony did. And there was some glaring oddities about the testimony of Dr. Phillips. Admittedly, he's a good surgeon. I acquiesced in him coming up with this opinion about whether surgery is needed. It's not off record. I suppose I can't mention it. But he had taken care of a patient of mine, a client of mine, and done a decent job of surgery on him. And I thought, well, to evaluate the need for surgery here, I see no problem. Well, it seems apparent from the letters that went back and forth, which are the exhibits to Dr. Phillips' deposition, Exhibits 2, 3, and 4. He starts out in those letters, and then his testimony seems to shift, in my view, towards a biased defense-type position. The so-called fusion is not, the autofusion that he talks about is not remarked about or mentioned or pointed out by the radiologist who did those films. Now, different people can have different views of what's there, I suppose. But the radiologist who did the December of 2007 films, which is the film that Dr. Phillips saw the autofusion on, the radiologist reports don't say anything about an autofusion. So in summary, how does Dr. Phillips' analysis or his opinion support your case? Can you summarize it? How does Dr. Phillips support my case? Is there anything in there that supports your case? Yes. The idea that a fusion, if there is a fusion there, the idea that that will cause permanent restriction of motion. He agrees to that. He also found a patchy diminished sensation in the L4-5 dermis, which I think is consistent with and supports what Dr. Coltrane is saying, that we've got L4-5 impingement on the L4 nerve. And I asked Dr. Phillips, well, wouldn't the culprit be something at the L4-5 level causing this? And he had to agree with that. But he doesn't particularly support my case. I understand that. And I think that his credibility, because of the oddities in his testimony, was rejected. Yes, he's a surgeon. If he would have stuck to the notion of surgery. Counsel didn't mention anything. She comes up with arguments about, as a matter of law, his testimony, it's like, as a matter of law, because I agreed to let him come up with an opinion about surgery, therefore, as a matter of law, his opinion should essentially overwhelm that of Dr. Coltrane on this issue of is there a permanent total disability, and is that coming from after effects of this phony remodeling of the infection that was left. She didn't say anything about that in her argument. Lastly, I did point out, and I got permission to file a reply to her response, to her reply. And I had to point out what I think is a glaring misrepresentation of the record. They are trying to say, essentially, that, well, he was on light duty for three weeks before June 1403 because of his back problems. That was not the case. The author of that is counsel, and that same counsel interrogated Dr. Coltrane and asked about was he on light duty yet. Why? It was a left hip problem. Was this his back? No. It's all in the record, and I cited the pages. This man, there is no reason to disturb the decision of the Industrial Commission. His ongoing condition is the Industrial Commission can reach the opinion they reach. There is support in the evidence for their opinion that he has got an element of his ongoing problem that is a cause of his permanent total disability right now, and that it is ongoing and causally connected to the accident because it created this bony prominence that, in turn, pinches nerves. Their decision is not contrary to the manifest weight of the evidence on either of the issues, and this concept about the idea that, well, he's got all these other problems. Well, you know, when he started working for this place, and to his credit, the man had a fusion in his neck, three procedures on his low back. He worked there for four and a half years, five years almost, doing a job that... Counsel, your time is up. Thank you. Thank you. Very accurate job. Rebuttal, please. Just briefly, I think, yes, in fact, Dr. Phillips' testimony needs to be taken into consideration in a different light than that of a Section 12 exam. And further, and following Justice Holdridge's questions, there is no orthopedic opinion to the contrary. Dr. Coltero testified Mr. Tribula has had low back pain and has been on medication since 1999. His right current right leg pain is because of preexisting conditions and a new injury when he fell at home in December of 2007. His left ankle symptoms are related to L2 and L5. The December 2007 MRI showed end plate damage now advancing at L3, and he cannot relate any of the gentleman's current symptoms to any particular level of the lumbar spine. Does the well-studded rule that it would be compensable, the industrial accident, need not be the sole cause or even the principal cause as long as it has some causal connection to the condition of well-being, does that rule have any applicability in this case? I think that it has applicability in every case, but the difference is, is the permanent total disability award, is the award of any additional benefits to this gentleman based on the work-related condition, which the doctors all agree is at L4-5, or is it based on other conditions which his own treating physician acknowledges he has had since before June 13, 2003? And then you look to the orthopedic surgeon, the only orthopedic surgeon's opinion that we have in this matter, which says the level that was damaged in the work incident is now stable. I'm not saying, as this Justice pointed out, that he doesn't have some problems and some symptoms, but does it rise to the level of a permanent total? And the answer is no. Thank you very much. Thank you, Counsel. The Court will take the matter under advisement for disposition. We'll stand in recess for a short period. There is a motion.